United States Court of Appeals,

Eleventh Circuit.

No. 95-8171.

UNITED STATES of America, Plaintiff-Appellee,

v.

John E. CALHOON, Defendant-Appellant.

Oct. 16, 1996.

Appeal from the United States District Court for the Middle District of Georgia. (No. CR-92-12-MAC(DF), Duross Fitzpatrick, Chief Judge.

Before KRAVITCH and BIRCH, Circuit Judges, and SCHWARZER[*], Senior District Judge.

SCHWARZER, Senior District Judge:

John E. Calhoon was charged in a 14-count indictment with violation of 18 U.S.C. § 1001 (false statements) and 18 U.S.C. § 1341 (mail fraud). At trial, the government dismissed two counts. The jury acquitted on one count and convicted on the remaining eleven. Each of the eight false statement counts of conviction charged Calhoon with signing or causing to be signed a Medicare cost report claiming amounts he knew not to be reimbursable. The three mail fraud counts of conviction charged him with devising a scheme to defraud with respect to three of the false cost reports by use of the mail. Calhoon appeals from the judgment of conviction. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3741(a) and affirm.

FACTUAL BACKGROUND

The charges against Calhoon arose out of actions he took while

[*]Honorable William W Schwarzer, Senior U.S. District Judge for the Northern District of California, sitting by designation.

employed by Charter Medical Corporation (CMC), a national hospital chain headquartered in Macon, Georgia and composed of both medical/surgical and psychiatric hospitals. Calhoon was responsible for obtaining Medicare reimbursement for a group of the psychiatric hospitals belonging to CMC. To obtain reimbursement, CMC filed cost reports with private insurance companies acting under contract with the Health Care Financing Administration (HCFA), the agency within the Department of Health and Human Services responsible for administering the Medicare program. These private insurance companies act as fiscal intermediaries to review and, as necessary, to audit cost reports to determine the amount of reimbursement to which the provider of Medicare-insured services is entitled. Calhoon chaired one of two sections at CMC responsible for filing cost reports with the intermediaries; in that capacity he supervised a group of accountants who prepared the reports.

To satisfy provider hospitals' cash requirements, the intermediaries paid CMC periodically throughout the fiscal year for estimated Medicare costs. At the end of the fiscal year, CMC filed annual cost reports for each hospital setting out the costs that it actually incurred. Based upon those cost reports, the intermediaries determined the correct amount of Medicare reimbursement for the year and either paid CMC the amount due or billed it for excess interim payments.

Cost reports filed on behalf of a provider hospital include a statement of the total costs expended by the hospital for each category of expense. Some costs included in a cost report are clearly identifiable as either reimbursable or nonreimbursable.

Other costs are subject to dispute.  In order for the provider hospital to preserve its right to challenge any potential disallowance of an item of cost or part thereof, the provider must include that item within the cost report.  The cost report filing process requires providers to identify accurately both the nature and the amount of the costs claimed, thereby permitting the intermediary to identify and disallow the nonreimbursable costs, while allowing the provider to preserve on appeal its claim for those costs which it deems reimbursable.  More specifically, on the settlement page of the cost report, the provider identifies as presumptively nonreimbursable the cost for which it nonetheless seeks reimbursement.  This is referred to as filing "under protest."  The intermediary then determines which costs are reimbursable based on the regulations enacted by the Secretary of Health and Human Services and a set of policy decision/guidelines called the Provider Reimbursement Manual ("Prov.Reimb.Man.").

Because of the sizeable volume of cost reports submitted to intermediaries, however, the intermediaries give only some cost reports a full audit, including a field visit by the intermediary to the hospital to compare the cost reports with the hospital's internal records.  Other cost reports receive only cursory review. When presented with a cost report, the intermediary generally does a preliminary desk audit to determine whether a field audit is appropriate based on the information presented by the provider.

After an intermediary conducts whatever audit it deems appropriate, it issues a notice of program reimbursement to the provider.  The provider then has 180 days to negotiate any disputed

issue with the intermediary or to file an appeal with an administrative body known as the Provider Reimbursement Review Board.

Calhoon's convictions were based on claims in cost reports filed on behalf of six different CMC hospitals between 1987 and 1989.

DISCUSSION

I. VIOLATION OF SECTIONS 1001 AND 1341

To sustain a conviction for violation of 18 U.S.C. section 1001, the government must prove (1) that a statement was made; (2) that it was false; (3) that it was material; (4) that it was made with specific intent; and (5) that it was within the jurisdiction of an agency of the United States. *See United States v. Lawson,* 809 F.2d 1514, 1517 (11th Cir.1987). To sustain a conviction for mail fraud under 18 U.S.C. section 1341, the government must prove (1) intentional participation in a scheme to defraud a person (including the government) of money or property; and (2) the use of the mails in furtherance of the scheme. *See United States v. Smith,* 934 F.2d 270, 271 (11th Cir.1991). The government charged that Calhoon's submissions by mail of the Medicare claims at issue constituted a scheme to obtain money by virtue of the false documentary claims. Thus, the mail fraud convictions rest on the false statement convictions. Calhoon challenges the validity of these convictions on the grounds that the statements at issue, *i.e.,* the claims for Medicare reimbursement, were neither false nor material.

We review *de novo* whether Calhoon's conduct violated sections

1001 and 1341. *See Lawson,* 809 F.2d at 1517. We also review *de novo* whether there was sufficient evidence to support the convictions; in so doing, we review the evidence in the light most favorable to the government, accepting all reasonable inferences and credibility choices made in the government's favor, to determine whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *See United States v. Keller,* 916 F.2d 628, 632 (11th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991); *United States v. Gafyczk,* 847 F.2d 685, 691-92 (11th Cir.1988).

A. *Falsity*

Falsity under section 1001 can be established by a false representation or by the concealment of a material fact. *See* 18 U.S.C. § 1001 ("Whoever ... falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes false, fictitious or fraudulent statements or representations ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."); *United States v. Tobon-Builes,* 706 F.2d 1092, 1096 (11th Cir.1983) (falsity based on concealment of a material fact). Calhoon's convictions were based on Medicare claims for three separate categories of expenses: (1) royalty fees paid to CMCI, a sister subsidiary, (2) interest paid to CMCI ("CMCI interest"), and (3) advertising costs claimed under the label of "outreach." Regarding the claims for royalty fees and CMCI interest, the government essentially maintains that Calhoon made false representations by claiming reimbursement for costs that were nonreimbursable under the applicable Medicare provisions. Calhoon

argues, however, that no provisions made these costs clearly nonreimbursable and claiming them as reimbursable therefore cannot be a false representation and the basis of criminal liability. Regarding the advertising costs, the government maintains that by claiming reimbursement for advertising costs under the term "outreach," Calhoon concealed the true nature of the costs as advertising, some of which is reimbursable and some of which is not. Calhoon argues, however, that "outreach" was a factually accurate description of the costs and a term accepted by the industry to describe certain advertising. Thus, he argues, claiming these costs as outreach cannot constitute falsity. For the reasons discussed below we conclude that the claims for all three types of costs were false for purposes of section 1001.

1. *The Intercompany Charges: Royalty Fees and CMCI Interest*

Linton Newlin, the person responsible for tax planning and related matters for CMC, testified that he created a Nevada corporation, CMCI, as a subsidiary of CMC in order to gain various tax advantages. CMC transferred ownership of the Charter name to CMCI, and individual hospitals then paid a one-time royalty fee to CMCI to use the Charter name. Because Charter is a national corporation, the hospitals benefitted from the use of the name and because CMCI was incorporated in Nevada where corporations are not subject to state income tax, CMCI increased its profits through tax savings.

Besides licensing the Charter name, CMCI obtained funds from the parent company and loaned the money to the CMC hospitals, which, in turn, paid back the principal with interest to CMCI. The

hospitals took a tax deduction for interest payments to CMCI, and CMCI paid no state corporate income tax on the interest income. Newlin testified that actual money was paid by the hospitals to CMCI on account of both the royalty fees and the CMCI interest.

Calhoon freely admitted both in an investigative interview and at trial that he believed at all times relevant that the royalty fees and CMCI interest were presumptively nonreimbursable under the applicable Medicare provisions. *See* R.A. Vol. 8, p. 134; R.A. Vol. 9, pp. 103-04. John Banfield (one of Calhoon's former subordinates) testified, and the jury accepted, that Calhoon instructed Banfield to claim for reimbursement the royalty fees and interest paid to CMCI but to recognize the probable disallowance of the claims by listing the amounts on reserve cost reports. R.A. Vol. 7, p. 161; R.A. Vol. 8, pp. 12-13; R.A. Vol. 9, p. 110.

a. *Royalty Fees*

The government contends that the royalty fees claimed were nonreimbursable because: (1) they were unrelated to patient care, *see* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9, and (2) they were not an actual expense, *see* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.17. It argues that the royalty fee amounted to a franchise fee paid to a related party for the use of the Charter name. As such, CMC money was simply being moved from one pocket to another, making the fee nonreimbursable because it was not an actual expense. *See* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.17. The government also argues that providers must accurately identify the nature and amount of each cost claimed. The cost reports here did not disclose that the royalty fees were paid to a

related company, CMCI.

Calhoon challenges his convictions based on the claims for royalty fees on the grounds that there are no statutes or regulations clearly prohibiting reimbursement of the royalty fees, and that the former policy guideline on reimbursement of royalty fees was repealed in 1982 and superseded by more general guidelines that arguably permit reimbursement. *See* Prov.Reimb.Man., Part 1 § 2133, *repealed by* Transmittal No. 263 (Mar. 1982); Prov.Reimb.Man., Part I § 2135. More specifically, Calhoon argues that the statutory and regulatory standards governing whether a royalty fee is reimbursable require only that the costs be "actually incurred" and reasonably related to patient care. *See* 42 U.S.C. § 1395x(v)(1)(A) (reimbursable costs include "reasonable cost of any services shall be actually incurred," except "incurred costs found to be unnecessary in the efficient delivery of needed health services"); 42 C.F.R. § 413.9 (reimbursements must be based on costs reasonably related to patient care). Calhoon contends that the royalty fees at issue were costs actually incurred because CMCI actually billed the hospitals and the hospitals paid the royalty fees to CMCI. As to whether the costs were reasonably related to patient care, Calhoon argues that the issue is open to debate and that the government failed to produce any evidence showing that the royalty fees were not related to patient care. Thus, Calhoon argues, his convictions cannot be upheld because the government failed to sustain its burden of negating any reasonable interpretation that would make the royalty fees reimbursable and thereby render the statements in the cost reports factually

correct. *See, e.g., United States v. Race,* 632 F.2d 1114, 1119-21 (4th Cir.1980) (government failed to satisfy its burden of proving falsity where billings were authorized under a reasonable interpretation of the terms of the authorizing contract); *United States v. Anderson,* 579 F.2d 455, 459-60 (8th Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). Moreover, Calhoon argues, because there is no definite legal standard making royalty fees nonreimbursable, his convictions are unconstitutional. *See Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) ("[F]undamental principles of due process ... mandate that no individual be forced to speculate, at the peril of indictment, whether his conduct is prohibited.... Thus, ... courts must decline to impose punishment for actions that are not "plainly and unmistakably' proscribed.").

(i) *Reimbursability*

We reject Calhoon's contention that there is no provision making the royalty fees paid to CMCI clearly nonreimbursable. Calhoon's arguments focus on whether any provision made the royalty fees clearly nonreimbursable by virtue of their nature as royalty fees. The critical fact is, however, that these royalty fees were paid to CMCI, a company related to the hospitals by common ownership. CMC, the parent company, owned both the hospitals that were paying the royalty fees for use of the Charter name and CMCI, the Nevada subsidiary that owned the Charter name and collected the royalty fees. Therefore, regardless of whether certain royalty fees are generally reimbursable, whether the royalty fees here were reimbursable is governed by 42 C.F.R. § 413.17 which applies to

expenses paid to related organizations.[1]  That regulation provides

in relevant part:

>     (a) *Principle.*  Except as provided in paragraph (d) of this section, costs applicable to services, facilities, and supplies *furnished to the provider by organizations related to the provider by common ownership or control* are included in the allowable cost of the organization *at the cost to the related organization.*  However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

>                    .    .    .    .    .

>     (c) *Application....* (2) If the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself.  An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. *Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization.* However, if the price in the open market for comparable services, facilities, or supplies is lower than the cost to the supplier, the allowable cost to the provider may not exceed the market price.

42 C.F.R. § 413.17.

Under this regulation, expenses paid by the hospitals to

CMCI—including the royalty fees at issue here—are reimbursable only

"at the cost to [CMCI], the supplying organization."  *See* 42 C.F.R.

§ 413.17(c).  At trial, the government's expert, Bessie Wheeler,

explained that royalty fees paid to a related company solely for

the use of a name would not be an actual expense for the company

---

[1]Calhoon challenges treatment of the hospitals and CMCI as "related organizations" under this regulation.  But the regulation clearly provides that organizations are "related" through common ownership, which "exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider."  *See* 42 C.F.R. § 413.17(b)(2).  Being commonly owned by CMC, the provider hospitals and CMCI are clearly related organizations within the meaning of the regulation.

and, therefore, would not be reimbursable by Medicare.  R.A. Vol. 6, p. 106.  She explained that, for the fee to be reimbursable, it would have to be paid in exchange for an actual service that the related company provided at a real cost.  *Id.*  The reimbursable costs related to the Charter name may have been actual costs of acquiring and maintaining the Charter trademark.  Whether the royalty fee paid is reimbursable depends in part on whether it reflected actual cost to CMCI of the acquisition or maintenance of the Charter name.  *See* 42 C.F.R. § 413.17.  If the royalty fees did not directly reflect such an actual cost, they would not have been reimbursable.  *See* 42 C.F.R. § 413.17;  *cf.* Prov.Reimb.Man., Part 1, § 1011.5 (Govt.Supp.Br., Ex. 7, p. 20) (policy guideline illustrating the application of § 413.17 in the context of a rental expense:  where provider leases a facility from a related organization, costs of ownership of the facility are the allowable costs, not the rent paid to the lessor by the provider).  The government, having apparently offered no evidence on this issue, failed to sustain its burden to prove the claim false by virtue of the nonreimbursable nature of the interest.

(ii) *Concealment of a Material Fact*

By concealing that the royalty fees were paid to a related company, however, Calhoon made the claim for reimbursement false. As stated above, falsity under section 1001 includes concealment of a material fact.  *See Tobon-Builes,* 706 F.2d at 1096.  Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form.  *See id.* at 1096;  *United States v. Hernando Ospina,* 798 F.2d

1570, 1578 (11th Cir.1986).  42 C.F.R. § 413.20(d) states that:

> (1)  The  provider  must  furnish  such  information  to  the
> intermediary as may be necessary to—
>
> (I) Assure proper payment by the program, *including the
> extent to which there is any common ownership or control (as
> described in § 413.17(b)(2) and (3)) between providers or
> other organizations,* and as may be needed to identify the
> parties responsible for submitting program cost reports;  ....

Moreover, the cost report forms specifically ask the provider the

following questions:

A. ARE THERE ANY COSTS INCLUDED ON WORKSHEET A [on which the
   royalty fees were claimed] WHICH RESULTED FROM TRANSACTIONS
   WITH  RELATED  ORGANIZATIONS  AS  DEFINED  IN  HCFA  PUB  15-I,
   CHAPTER 10?

B.  COSTS  INCURRED  AND  ADJUSTMENTS  REQUIRED  AS  RESULT  OF
    TRANSACTIONS WITH RELATED ORGANIZATIONS:

C. INTERRELATIONSHIP OF PROVIDER TO RELATED ORGANIZATION(S):

The cost report form then specifically notifies the provider that:

> THE SECRETARY, BY VIRTUE OF AUTHORITY GRANTED UNDER SECTION
> 1814(B)(1) OF THE SOCIAL SECURITY ACT, REQUIRES THE PROVIDER
> TO FURNISH THE INFORMATION REQUESTED ON PART C....
>
> THE  INFORMATION  WILL  BE  USED  BY  THE  HEALTH  CARE  FINANCING
> ADMINISTRATION AND ITS INTERMEDIARIES IN DETERMINING THAT THE
> COSTS  APPLICABLE  TO  SERVICES,  FACILITIES,  AND  SUPPLIES
> FURNISHED BY ORGANIZATIONS RELATED TO THE PROVIDER BY COMMON
> OWNERSHIP OR CONTROL, REPRESENT REASONABLE COSTS AS DETERMINED
> UNDER SECTION 1861 OF THE SOCIAL SECURITY ACT.

The  relevant  cost  reports  failed  to  disclose  that  CMCI  was  a

related organization and was receiving the royalty fees claimed for

reimbursement.  This fact, as discussed above, is critical to the

determination whether the royalty fees could be reimbursable.  Its

concealment constitutes falsity for purposes of section 1001.

### b. *CMCI Interest*

The government contends that the CMCI interest payments were

nonreimbursable  because  they  were  expenses  paid  to  a  related

company. *See* 42 C.F.R. § 413.17 and discussion *supra* pp. ---- - ----. The government argues that the interest did not represent actual costs incurred by CMCI, as required by 42 C.F.R. § 413.17. The payment of interest, the government argues, was merely movement of money from one pocket of CMC, the parent corporation, to another. Calhoon argues, however, that the government at no time attempted to show that the interest expense did not represent an actual cost and, therefore, did not bear its burden of proving the falsity of the statement.

Don Crosset, former head of Charter's Medicare reimbursement division from 1981 through 1987, testified that the hospitals were taking out loans for new construction. *See* R.A. Vol. 7 p. 58. The actual cash ultimately loaned to the hospitals "was being generated" by CMC, the parent corporation. *Id.* CMC then "funded out [that cash] to the Nevada company," CMCI, and CMCI "in turn, loaned [the money] to the hospitals." *Id.* Crosset testified that, as a result of these transactions, there was a reimbursable cost to CMC, the parent company. The company policy was for CMC to account for that cost in claims for the home office expenses. In order to avoid duplicating costs, CMC had an internal policy that individual hospitals should not claim the CMCI interest as reimbursable.[2]

As discussed above, where a provider obtains services, facilities, or supplies from a related organization, the reimbursable cost includes only "*the costs for these items at the cost to the supplying organization.*" 42 C.F.R. § 413.17. In this

_____

[2]The government does not contend that the amounts claimed are not reimbursable because the claims are duplicative.

case, the supplying organization obtained the money loaned to the hospital from yet another related organization, the parent company. *See* 42 C.F.R. § 413.17(b)(1) ("Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."); 42 C.F.R. § 413.17(b)(3) ("Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."). Whether the interest paid by the hospital to CMCI is reimbursable depends on whether it reflected the actual cost to CMC, the related organization that was ultimately the source of the loan. *See* 42 C.F.R. § 413.17. If the interest claimed was actually the amount of interest CMC was paying an outside lender for the money or the exact income stream foregone by CMC when it chose to lend the money to a subsidiary rather than to invest it outside of the enterprise, the CMCI interest may have been reimbursable. *See* 42 C.F.R. § 413.17; R.A.Vol. 6, p. 111 (testimony of Wheeler, the government's expert, that whether the CMCI interest was reimbursable under the regulations pertaining to related company transactions depended on where the related organization obtained the money); *cf.* Prov.Reimb.Man., Part 1, § 1011.5 (described *supra* p. ----). The government having offered no evidence about the source of the money obtained by CMC, the cost to CMC to obtain it, or the aggregate cost of CMC's loaning it to CMCI and of CMCI's loaning it to the hospital, failed to sustain its burden of proving that the interest payment was nonreimbursable.

Nonetheless, as with the royalty fees, the cost reports the government introduced demonstrate that Calhoon concealed that the CMCI interest was an expense paid to a related organization. As discussed above, this fact was critical to the determination of whether it could be reimbursable. Its concealment constitutes falsity for purposes of section 1001. *See supra* p. ----.

2. *Advertising Expense Claimed as "Outreach"*

Four of Calhoon's section 1001 convictions relate to claims he made for reimbursement of advertising costs. Calhoon filed cost reports in which he claimed various types of advertising expenses under the label "outreach." In addition, he created a second set of books—new general ledgers—which collapsed into one account labelled "outreach" advertising accounts that appeared separately in other ledgers. The government maintains that Calhoon intentionally disguised advertising costs as outreach in order to mislead the intermediaries and to obstruct their audits. The government essentially argued falsity under section 1001 based on concealment of a material fact.

Calhoon, on the other hand, contends that the term "outreach" accurately describes the advertising and that the term is recognized in the industry. He therefore argues that claiming reimbursement for advertising costs under that label could not be false.

42 C.F.R. § 413.20(d) states that "[t]he provider must furnish such information to the intermediary as may be necessary to ... [a]ssure proper payment by the program...." Under the guidelines in the Manual, certain advertising costs are reimbursable and

others are not. *See* Prov.Reimb.Man. § 2136. The Manual provides that advertising costs are generally reimbursable if reasonably related to patient care and primarily designed to advise the public of the services available through the hospital and to present a good public image, but not if designed to increase patient census. *See* Prov.Reimb.Man. § 2136.1. That certain advertising costs are presumptively nonreimbursable obligates a provider seeking reimbursement to identify the costs as "advertising" and to reveal the nature of the advertising. In addition, 42 C.F.R. § 413.20(a) requires providers to maintain financial records for proper determination of reimbursable costs using "[s]tandardized definitions ... that are widely accepted in the hospital and related fields...." Thus, Calhoon had a legal duty to disclose both in the cost reports and in the general ledgers that the costs claimed were in fact "advertising" costs. Instead, he chose to call the costs "outreach," thereby concealing the potentially nonreimbursable nature of the costs.

Wheeler, the government's expert witness, testified that in 22 years' experience with Blue Cross/Blue Shield of South Carolina, she had never seen the term "outreach" used in Medicare cost reporting; nor had she ever heard "outreach" as a synonym for advertising. R.A.Vol. 6, p. 101. Moreover, Calhoon, a former fiscal intermediary, knew that this term would conceal the nature of the costs and nonetheless chose to use the label specifically for that reason. As one of his subordinates testified, Calhoon admitted that the "outreach" account was created so that there would be no red flag alerting Medicare auditors to the

nonreimbursable advertising expenses. *See* R.A.Vol. 8, p. 116. Calhoon similarly told another subordinate that "if just one intermediary misses an adjustment because it is called outreach, these general ledgers have served their purpose." *See* R.A.Vol. 8, p. 205. The evidence was sufficient to lead a reasonable jury to conclude beyond a reasonable doubt that, by using the term outreach, Calhoon concealed the true nature of the advertising costs claimed for reimbursement, thus establishing falsity under section 1001.

3. *Medicare as a Flexible, Discretionary System*

Calhoon also makes a more general argument that claiming costs for Medicare reimbursement can never give rise to criminal liability so long as the costs claimed were actually incurred. He justifies this contention on the grounds (1) that because Medicare is a flexible and discretionary reimbursement system in which the administrative guidelines in the Provider Reimbursement Manual give only presumptive guidance, (2) that the intermediaries' decisions are only presumptive, and (3) that the denial of reimbursement can be challenged on appeal. *See Shalala v. Guernsey Memorial Hospital,* 514 U.S. ----, ---- - ----, ----, 115 S.Ct. 1232, 1236-37, 1238-39, 131 L.Ed. 106, 116-17, 119 (1995) (intermediary's disallowance based on Manual guidelines is presumptive only, and subject to appeal); *Medical Center Hosp. v. Bowen,* 839 F.2d 1504, 1512-13 (11th Cir.1988) (same). Calhoon argues that under this system he is entitled to claim reimbursement for costs that may be nonreimbursable and, therefore, that doing so can never be a false statement.

While it is true that a provider may submit claims for costs it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement. Nothing less is required if the Medicare reimbursement system is not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government. As Wheeler, the government's expert witness testified, if a provider disagrees with the intermediary, with the intermediary's past decisions, with the instructions or guidelines in the Provider Reimbursement Manual, or with the regulations, the provider must file the cost report "under protest." *See supra* p. ----. Calhoon testified that he understood this system of filing presumptively nonreimbursable costs and that he, in fact, used this system for other types of costs claimed in the very cost reports at issue here. Yet he failed to follow this procedure for the royalty fees, the CMCI interest, or the advertising costs.

In sum, Calhoon's argument misses the crux of his offense: the filing of reports intended and designed to deceive and mislead the auditors for the purpose of obtaining reimbursement of costs Calhoon knew to be at least presumptively, if not clearly, nonreimbursable. Available time and resources do not permit audit of more than a fraction of the cost reports filed. Calhoon's filing of reports claiming costs that were at least presumptively nonreimbursable while concealing or disguising their true nature was a deliberate gamble on the odds that they would not be questioned.

The evidence amply sustains the findings of falsity.

B. *Materiality*

The trial court, without objection, instructed the jury that the false statements were material as a matter of law. Following the trial, the Supreme Court decided *United States v. Gaudin,* --- U.S. ----, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) holding that materiality is a jury issue. The *Gaudin* holding applies retroactively to this appeal. *See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

We review assertions of error not objected to at trial for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 732-34, 113 S.Ct. 1770, 1776-78, 123 L.Ed.2d 508 (1993). This is true even where, as here, error arose only by virtue of a later Supreme Court decision. *See United States v. Kramer,* 73 F.3d 1067, 1074 (11th Cir.1996). Under plain error review, reversal for unobjected-to error is permitted, though not required, where the error is both (1) plain and (2) affects substantial rights. *Olano,* 507 U.S. at 732-36, 113 S.Ct. at 1776-79; *Kramer,* 73 F.3d at 1074. The failure to submit the question of materiality to the jury is plain error. *Kramer,* 73 F.3d at 1074. Therefore, we need only address the question whether Calhoon's substantial rights were affected, *i.e.,* whether the failure to submit the issue of materiality to the jury affected the outcome of his trial. *See id.* at 1075. We conclude that it could not have affected the outcome because there is no reasonable argument that the statements at issue here were not material.

"To satisfy the element of materiality, it is enough if the

statements had a "natural tendency to influence, or be capable of affecting or influencing a government function.' " *United States v. Diaz,* 690 F.2d 1352, 1357 (11th Cir.1982) (quoting *United States v. Markham,* 537 F.2d 187, 196 (5th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977)). We have explained that:

> The Government does not have to show actual reliance on the false statements. A statement can be material even if it is ignored or never read by the agency receiving the misstatement. False statements must simply have the capacity to impair or pervert the functioning of a government agency.

*Diaz,* 690 F.2d at 1357 (citing *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir.), *cert. denied sub nom. Bella v. United States,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)).

Calhoon argues that whether the costs he claimed were reimbursable was debatable and that he therefore had the right to claim them on the cost report. Under the regulatory review process, the intermediary conducts an independent investigation and determines the reimbursability of the costs. If the intermediary determines the costs are nonreimbursable, the provider is denied payment. Essentially, Calhoon argues that because there is an intermediate step—the audit—his claims did not have the capacity to influence the government. But this ignores that the intermediaries necessarily rely on the information provided in the cost report to make their reimbursability determinations, and it ignores the reality of limited audit capability. *See* R.A.Vol. 6, pp. 70-71. The cost reports were sufficient to persuade the intermediary to authorize reimbursement without further investigation. They, therefore, had the capacity " "to impair or pervert the functioning

of a government agency' " by misleading the intermediaries. *See Diaz,* 690 F.2d at 1357 (citing *Lichenstein,* 610 F.2d at 1278).

Moreover, it makes no difference that the initial review for reimbursement is done by the intermediary as opposed to the government agency itself. The intermediaries are acting under contract with the Department of Health and Human Services, which relies, at least in part, on the intermediaries' determination as to reimbursability of the costs.

## II. SENTENCING ISSUES

### A. *Guideline Computation*

Calhoon argues that the district court erred in determining that he is responsible for $31,000 in intended losses pursuant to U.S.S.G. § 2F1.1(b)(1). He contends that only actual loss is relevant and that the Medicare program sustained none.

Section 2F1.1(b)(1) of the United States Sentencing Guidelines requires that the offense levels be adjusted upward based on the loss attributable to the defendant. Loss "need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2B1.1, comment. (n. 3) (1988); *see* U.S.S.G. § 2F1.1, comment. (n. 7) (1988) (referring to § 2B1.1). This court reviews district court loss calculations for clear error. *United States v. Menichino,* 989 F.2d 438, 440 (11th Cir.1993).

At sentencing, the government argued that Calhoon should be held responsible for attempting to defraud the Medicare program of $1,596,365. R.A.Vol. 11, p. 22. The government arrived at this figure through a complex series of calculations based on the

Medicare regulations.  Calhoon argued that the government sustained no actual loss and that no loss was intended.  R.A.Vol. 11, pp. 189-90.  He admitted, however, that suspect entries on the cost reports had a potential "reimbursement effect" of approximately $31,000.  R.A.Vol. 11, pp. 69, 139.  Both parties presented witnesses and other evidence in support of their contentions at the day-long sentencing hearing.  The sentencing court, noting that it had "as many questions at the end of the day as [it] had at the beginning," rejected the government's figure and imposed sentence based on the $31,000 figure suggested by Calhoon.  R.A.Vol. 11, p. 193.  We find no error.

Calhoon's assertion that he should be held responsible only for actual loss is without merit.  The Sentencing Guidelines recognize that attempted or intended loss is a valid measure of culpability.  U.S.S.G. § 2F1.1, comment. (n. 7) (1988);  *United States v. Shriver,* 967 F.2d 572, 574 (11th Cir.1992).  Calhoon's reliance on *United States v. Wilson,* 993 F.2d 214 (11th Cir.1993), is misplaced.  In  *Wilson,* this court held that incidental or consequential loss is not relevant for purposes of sentencing.  *Id.* at 217.  *Wilson* did not hold that actual loss need always be calculated;  nor did it hold that *intended* loss is an inappropriate measure of loss.  At sentencing, Calhoon admitted that, if the disputed claims had not been intercepted by an auditor, the claims could have netted CMC an additional $31,000 in reimbursements.  That admission is sufficient to establish that, in making the false statements, he intended that the government suffer a loss in that amount.  *Cf. Shriver,* 967 F.2d at 574.

B. *Acceptance of Responsibility*

Calhoon argues that the district court's refusal to grant an adjustment for acceptance of responsibility amounted to a penalty for exercise of his Sixth Amendment right to trial by jury. The government argues that the district court's decision was not clearly erroneous and that Calhoon's constitutional rights were not infringed.

A defendant bears the burden of showing that he is entitled to an acceptance of responsibility reduction. *United States v. Anderson,* 23 F.3d 368 (11th Cir.1994). Even a defendant who pleads guilty is not entitled to a sentencing reduction for acceptance of responsibility as a matter of right. *United States v. Anderson,* 23 F.3d at 369; *see United States v. Cruz,* 946 F.2d 122, 126 (11th Cir.1991). "[A]cceptance of responsibility" is a "multi-faceted concept," which considers

> among other things, the offender's recognition of the wrongfulness of his conduct, his remorse for the harmful consequences of that conduct, and his willingness to turn away from that conduct in the future.

*United States v. Scroggins,* 880 F.2d 1204, 1215 (11th Cir.1989), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). This court reviews district court findings regarding acceptance of responsibility for clear error. *United States v. Carroll,* 6 F.3d 735, 739 (11th Cir.1993) *cert. denied sub nom. Jessee v. United States,* 510 U.S. 1183, 114 S.Ct. 1231, 127 L.Ed.2d 576 (1994).

At sentencing, Calhoon argued that he should be given credit for acceptance of responsibility because he had cooperated fully with authorities and had not denied any of the alleged overt acts.

R.A.Vol. 11, pp. 4-6; PSI Addendum. He also argued that the denial of an adjustment would infringe his right to trial by jury. *Id.* The district court determined that Calhoon was not entitled to a reduction for acceptance of responsibility because he had not accepted responsibility at all. The court expressed its unease about awarding Calhoon credit for accepting responsibility, pointing out that the guidelines anticipate remorse and acknowledgment of wrongdoing. R.A.Vol. 11, p. 170. The court offered Calhoon an opportunity to accept responsibility before the sentence was imposed, but Calhoon declined to do so. Because, at sentencing, Calhoon maintained that the acts underlying his conviction were not improper, the court did not err in denying adjustment for acceptance of responsibility.

Nor does such a denial violate Calhoon's constitutional rights. As this court has previously recognized, a reward in the form of an adjustment for acceptance of responsibility for those who plead guilty "does not equate with punishing one who does not follow such a course." *United States v. Castillo-Valencia,* 917 F.2d 494, 501 (11th Cir.1990), *cert. denied sub nom. Pulido-Gomez v. United States,* 499 U.S. 925, 111 S.Ct. 3120, 113 L.Ed.2d 253 (1991); *see also Carroll,* 6 F.3d at 739-40) (Fifth Amendment right not to testify not infringed by failure to grant adjustment for acceptance of responsibility).

III. OTHER ISSUES

Calhoon raises a number of other issues, all of which are meritless. We address each briefly below.

A. *Count Four Conviction: 100 Percent of Advertising Costs Were Reimbursed*

Calhoon argues that the conviction on count four must be reversed because the outreach costs claimed were actually reimbursed. But the fact of reimbursement affects neither the falsity nor the materiality of the statement in the cost report claiming advertising costs as outreach.

"A document is false when made or used, if it is untrue and is then known to be untrue by the person making or using it." *Eleventh Circuit Pattern Jury Instructions, Criminal Cases,* Offense Instruction 29 (1985); *see United States v. Anderson,* 579 F.2d 455 (8th Cir.1987). What made the claim for outreach false was that it concealed a material fact—the nature of the costs as advertising costs, which may or may not have been reimbursable. Calhoon, therefore, made a false statement the moment "outreach" was claimed in the cost report and supported by a general ledger reflecting the same. That the costs were ultimately reimbursed does not make the statement true when made.

As to materiality, section 1001 does not require proof that the statement actually misled the government; the false statement need only "have the capacity to impair or pervert the functioning of a government agency." *Diaz,* 690 F.2d at 1357 (citing *Lichenstein,* 610 F.2d at 1278).

B. *TEFRA and LCC Limitations*

Two types of limitations set a ceiling on Medicare reimbursement. One is the "LCC" limitation: A provider may be reimbursed only for the lower of either actual costs or the charges for the services. The other was imposed by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). Under TEFRA, a target

amount is determined according to a hospital's cost reporting "base" period, usually the first 12-month reporting period of its history. The target amount is set by taking the hospital's base year, determining the cost per Medicare case, and capping future claims based on the base cost. R.A.Vol. 7, p. 37. The provider generally is not reimbursed for costs exceeding the TEFRA target amount.

Calhoon argues that the TEFRA target rates applied to the cost reports relevant to all counts other than 2, 12, and 13. He points out that, although he did not self-disallow the royalty fees, CMCI interest, or advertising costs on the statement of total costs made in the cost reports, the total allowable costs without those disputed claims exceeded the TEFRA target amount. Because of the TEFRA cap, Calhoon argues, the government could not have been misled and his statements were, therefore, immaterial. The government responds that the TEFRA limitation could only have affected counts 6, 7, and 14 and that the TEFRA ceiling can be protested so as to permit increased reimbursement.

So far as we can tell from the record, the TEFRA limitation did not specifically bar reimbursement for any of the claimed nonreimbursable costs; all the cost reports are therefore material. In any event, the existence of the ceiling does not exculpate Calhoon from having made false reports.

C. *Count Five: Calhoon Not "Official" Supervisor*

Calhoon also argues that the conviction on count 5 must be reversed because, at the time this report was filed, he had not yet become reimbursement manager, and therefore, he could not have been

responsible for the relevant cost report or have "caused" it to be filed. However, the evidence shows that Parker, the person who submitted the report, was "instructed and advised" by Calhoon and that he considered Calhoon his supervisor. That evidence is sufficient to establish that Calhoon "caused" the falsity as alleged in the indictment.

D. *Deliberate Ignorance Instruction*

Calhoon argues that the "deliberate ignorance" charge was unsupported by the evidence and, therefore, should not have been given to the jury. In determining whether sufficient evidence supported a jury charge, we review the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469-70, 86 L.Ed. 680 (1942).

Calhoon testified at trial that he knew royalty fees were not reimbursable but that he simply had not noticed they were included in a cost report because of his role as a hands-off manager. On this evidence, the jury could properly be instructed that he deliberately avoided knowledge of the specifics of reports. *See United States v. Langford,* 946 F.2d 798, 801-02 (11th Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1562, 118 L.Ed.2d 208 (1992). Moreover, the evidence shows that Calhoon actually instructed his subordinates to claim the nonreimbursable costs. In view of the evidence of his direct involvement, it is difficult to see how the instruction could have been prejudicial.

E. *Admission of Opinion Testimony on Outreach/Advertising*

William E. Hoffman, Jr., former Senior Manager and Director of Appeals at CMC, testified that he had told Calhoon he did

not think that it was proper to collapse all advertising accounts into a single account called "outreach" both because not all advertising was outreach and because collapsing the advertising into a single account did not specifically identify the reimbursable outreach costs. Hoffman testified that Calhoon disagreed. They therefore discussed the matter with Richard Shackelford, an attorney who handled CMC's appellate matters when outside counsel was required. Hoffman asked Shackelford his opinion as to whether it was appropriate to file the collapsed ledgers. At trial, Calhoon's counsel objected to Hoffman's testifying about Shackelford's answer on the ground that it was hearsay. After hearing argument from both parties on the matter, the district court overruled the objection, permitting Hoffman to testify that Shackelford said that they should absolutely not be filing the collapsed general ledgers. Calhoon challenges the admission of Shackelford's statements on the grounds that it was hearsay and irrelevant and that any relevance it did have was outweighed by danger of unfair prejudice. *See* Fed.R.Evid. 402, 403, 801, 802.

Calhoon cites *United States v. Race,* 632 F.2d 1114 (4th Cir.1980) in support of his argument. In *Race,* the falsity of the statements that served as the basis for a section 1001 conviction depended upon the interpretation of terms of a contract. The court held that expert testimony on the meaning of the contract terms was superfluous and improper. *Race,* 632 F.2d at 1119-20.

Calhoon apparently cites *Race* for the proposition that the testimony here was erroneously admitted because it constituted

expert testimony on the meaning of the Medicare regulations in relation to whether claiming the advertising costs as "outreach" was unlawful. However, the government offered Hoffman's testimony about Shackelford's statements not for the truth of Shackelford's statements, but to prove that Calhoon was on notice that there was reason to question the propriety of his actions. Therefore, the testimony was not hearsay and was relevant to whether Calhoon had knowingly filed false claims. *See* Fed.R.Evid. 801(c); *United States v. Gold,* 743 F.2d 800, 817-18 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985) (where former employees testified that they had put their superiors on notice that there was reason to question whether the company's billing practices were in compliance with the law, court held the testimony relevant because it established that the conspirators had reason to know that their activities were illegal).

On whether the probative value was outweighed by an unfair prejudice, this court defers to the discretion of the trial court. *United States v. Elkins,* 885 F.2d 775, 784 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). We will reverse the trial court's decision to admit the testimony only if it were clearly an abuse of discretion. We find none here. The trial court instructed the jury regarding the limited purpose for which the testimony was offered. Moreover, in light of our conclusion that collapsing the advertising accounts into one category called "outreach" resulted in a false statement, we see no *unfair* prejudice that could have come from the challenged testimony.

F. *Denials of Motions for New Trial and for Directed Verdict and Acquittal*

Finally, Calhoon challenges the district court's denial of both his motion for a new trial and his motion for a directed verdict and acquittal.  The foregoing discussion disposes of the merits of those challenges.  The evidence was clearly sufficient to sustain Calhoon's convictions, so the trial court did not err in denying Calhoon's motions.

The judgment is AFFIRMED.