[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10750

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

TERRI LYNN HANKERSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 0:22-cr-60227-JIC-1

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Terri Lynn Hankerson appeals her conviction for one count of theft of government funds and her sentence of five months' imprisonment followed by three years' supervised release with the first five months of supervised release to be served on home confinement. She makes two arguments on appeal. First, she argues that the district court erred by giving the jury a deliberate ignorance instruction because the evidence pointed to a lack of actual knowledge. Second, she argues that the district court erred when it declined to sentence her to probation instead of imprisonment, arguing that the court constrained itself incorrectly to the guidelines commentary. After review, we affirm.

## I.    Background

On October 25, 2022, a grand jury indicted Hankerson on one count of theft of government funds, in violation of 18 U.S.C. § 641. Hankerson pleaded not guilty, and the case proceeded to trial.

Hankerson's father, Tommie Hankerson ("Tommie") received Social Security retirement benefits via direct deposits between June of 1991 and February of 2020. In 2020, the SSA noticed that Tommie was receiving Social Security benefits but not using his Medicare benefits. It notified Dominick Stokes, an Assistant Special Agent with the SSA Office of the Inspector

General.[1] Stokes ordered a copy of Tommie's death certificate and determined that Tommie had died in June of 2016. Despite having died in June of 2016, Tommie continued to receive Social Security deposits into his bank account through February 2020. By the time the SSA caught the issue, Tommie's account had been overpaid by $48,328.

Testimony revealed that Hankerson, aged 58 at the time of her trial, was fairly involved with Tommie's finances. Hankerson and her sister lived with their parents and managed their parents' finances. Hankerson was added as a joint account holder on Tommie's bank account in 2014,[2] and she received a debit card for that account in 2015. She was the only person with access to the account.

The government introduced bank statements showing consistent cash withdrawals and purchases from the account after

---

[1] Alana Oliver, an employee with the Social Security Administration ("SSA"), testified to the following. The SSA typically learns of a beneficiary's death via state records or from reports from family members. But these methods are not always reliable. Sometimes the SSA is suspicious that a beneficiary has died, and so it conducts its own investigation. One situation that triggers such an investigation is when a beneficiary is still receiving SSA payments but not using his or her Medicare benefits. The SSA will try to track the beneficiary down by mailing and calling the beneficiary. And if the SSA suspects that someone other than the beneficiary is receiving the benefits, the SSA will refer the case to the Office of Inspector General.

[2] Tommie's wife, Gwendolyn Hankerson ("Gwendolyn") was also on the account, and Tommie's son, Charles Holiday, was listed as a beneficiary. Gwendolyn passed away in February of 2014.

Tommie's death.   For example, there were withdrawals by a Sunpass account, deposits made for a cruise, and purchases for a Miami Heat game and concert tickets, all in Hankerson's name. There were also direct deposits from Hankerson's place of employment into the account until February of 2017.

When Agent Stokes interviewed Hankerson, Hankerson confirmed that her father had died and that she was affiliated with his bank account.  Hankerson stated that she had used her father's Social Security money to pay for his funeral expenses.  Agent Stokes then asked her whether she had used the funds to make any other purchases in her name.  Agent Stokes testified that, in response to his question, Hankerson began to cry, and admitted that she had made other purchases too.  She then apologized and told Agent Stokes that "she knew she shouldn't have done this, she went to law school, [and] she knew better."  She said that she would help pay it back.

After the government rested, Hankerson testified to the following.  After her father died, she went to the SSA with a copy of his death certificate.  Her parents had told her that she and her siblings would inherit their parents' retirement savings in the bank account in question.  She was made a joint owner of the bank account at some point in the early 2000s.  She knew her father received "retirement annuities, pension [payments,] and SSA benefits."  While she initially denied looking at her father's bank account statements while he was alive, she later admitted that she looked at the statements when her father was alive as part of her

efforts to manage his finances when he could no longer do so.  But she did not view the account statements after he passed away. Instead, she kept track of the balance of the account by visiting ATMs and checking the balance.  In July of 2016, when she visited an ATM, she noted that there was less money in the account, which she believed was because the Social Security payments stopped. Between July 2016 and February 2020, she thought the deposits coming into the account were from her father's retirement.  She first realized there was an issue with the Social Security benefits when Agent Stokes came to her home to interview her in 2021. Hankerson explained that she did not intend to steal and did not know that the money came from the SSA.

At the close of evidence, the government asked for a deliberate ignorance instruction.[3]  Hankerson objected, arguing that the evidence did not show that she affirmatively attempted to avoid learning about the source of the money.  The district court overruled Hankerson's objection.  It explained that Hankerson had looked at her father's bank account statements before her father's death, but then stopped suddenly once he died.  The court also characterized Hankerson's failure to look at the bank statements a single time over the course of four years as "somewhat incredulous."  The court then issued the following instruction:

---

[3] The government also asked for a deliberate ignorance instruction during a preliminary charge conference after the government rested, but the court denied the request.  It stated that, at that point, there had only been evidence supporting actual knowledge rather than a course of avoidance.

Deliberate avoidance of positive [knowledge], which is the equivalent of knowledge, occurs, for example, if a defendant possesses a package and believes it contains a controlled substance, but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.  So you may find a defendant knew about the possession of a controlled substance, if you determine beyond a reasonable doubt, Number one, that the defendant actually knew about the controlled substance, or Number two, the defendant had every reason to know, but deliberately closed her eyes.  But I must emphasize that negligence, carelessness[,] or foolishness is not enough to prove that the defendant knew about the possession of the controlled substance.

The jury returned a guilty verdict as to Count 1.  Based on a total offense level of 12 and a criminal history category of I, Hankerson's guideline imprisonment range was 10 to 16 months. The combination of her total offense level and criminal history category also placed Hankerson in Zone C of the Sentencing Table. U.S.S.G. § 5(A). The United States Probation Office explained that because her guideline range was in Zone C of the Sentencing Table, Hankerson's minimum term could be satisfied by "(1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e) [of U.S.S.G. § 5C1.1], provided that at least one-half of the minimum term is satisfied by

imprisonment, § 5C1.1(d)."   Additionally, the probation office explained that, although Hankerson was statutorily "eligible for a term of not less than one nor more than five years' probation" under 18 U.S.C. § 3561(c)(1), because the guideline range was in Zone C of the Sentencing Table, she was ineligible for probation under the guidelines, citing U.S.S.G. § 5B1.1, comment n.2.

At the sentencing hearing, neither party objected to the PSI. The government recommended a sentence at the low end of the guidelines.  It requested 10 months, which included five months of imprisonment, followed by five months in a halfway house, two years of supervised release, restitution, and a forfeiture order.  It argued that the nature and circumstances of the offense, Hankerson's characteristics, general deterrence, respect for the law and just punishment, the seriousness of the offense, and avoidance of sentencing disparities among other defendants supported its recommendation.

Hankerson requested a non-imprisonment sentence.  She argued that she had a clean record before this incident and she had already been punished by losing her job with the state, pension, and state benefits, and that it would cost thousands of dollars to incarcerate her, and incarceration would prevent her from paying the government back.  She then allocuted and apologized for her actions, requesting a probationary sentence so she could work to pay back the government.

The court adopted the PSI's calculations and determined that Hankerson was not eligible for probation.   The court

considered the statements of all parties, the PSI, the guidelines, and the 18 U.S.C. § 3553(a) factors. The court characterized Hankerson's actions as "inexplicable," and noted that the explanation she provided on the witness stand was "incredulous." The court also emphasized the importance of deterrence in this case, stating that sentences in cases like this "should tell the public that if you steal government funds, particularly taxpayer funds, that there's punishment attached, punishment sufficient to deter other people from committing a similar crime." The court then imposed the government's proposed sentence of five months' imprisonment, followed by five months' home confinement and three years' supervised release. The court also ordered Hankerson to pay $48,328 in restitution. Hankerson did not object to the sentence or manner in which it was imposed. She requested bond pending appeal, which was denied. After entry of final judgment, Hankerson appealed.

## II.    DISCUSSION

Hankerson argues that the district court erred by giving a deliberate ignorance jury instruction. She also contends that the district court erred when it declined to sentence her to probation, arguing that the court incorrectly constrained itself to the guidelines commentary. We address each argument in turn.

### A. Deliberate Ignorance Instruction

Hankerson argues that the district court erred in providing a deliberate ignorance instruction to the jury, because the evidence pointed to only a lack of actual knowledge and there was no

evidence that she deliberately avoided learning the source of the money.

A challenge to a deliberate ignorance instruction is reviewed *de novo*. *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993). The district court has broad discretion to formulate its jury charge as long as the charge as a whole accurately reflects the law and facts. *United States v. Williams*, 526 F.3d 1312, 1320 (11th Cir. 2008). We will not reverse a "conviction based on a challenge to the jury charge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013) (quotations omitted); *see also United States v. Isnadin*, 742 F.3d 1278, 1296 (11th Cir. 2014) ("We will not reverse a conviction because of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." (quotations omitted)).

In determining whether there is sufficient evidence to support a jury charge, "we review the evidence in the light most favorable to the government." *United States v. Calhoon*, 97 F.3d 518, 533 (11th Cir. 1996). The defendant's own testimony can be used as the basis for finding that a deliberate ignorance instruction is warranted. *See id.* Further, when a defendant chooses to testify, the defendant's own testimony may be treated as non-credible and substantive evidence of his guilt. *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004).

We recognize deliberate ignorance as an alternative to an actual knowledge requirement that applies when a defendant is suspicious of the situation but does not make further inquiries so as to remain ignorant. *United States v. Hristov*, 466 F.3d 949, 952 (11th Cir. 2006). Therefore, if "the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution," then the deliberate ignorance instruction is appropriate. *United States v. Garcia-Bercovich*, 582 F.3d 1234, 1237–38 (11th Cir. 2009) (quotations omitted). "The standard is the same whether the evidence is direct or circumstantial." *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotations omitted). On the other hand, district courts err in giving the deliberate ignorance instruction when there is relevant evidence of only actual knowledge rather than deliberate avoidance. *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008).

Here, the deliberate ignorance instruction was proper. Hankerson testified that she checked the statements on her father's account while he was alive. And she knew that her father was receiving money from the SSA before his death. But Hankerson immediately stopped checking the statements on the account after her father's death, despite making ongoing extensive expenditures from the account. Viewing the evidence in the light most favorable to the government, there is at least circumstantial evidence that supported an inference that Hankerson was deliberately ignorant

of receiving funds that she was not entitled to.[4] *See Calhoon*, 97 F.3d at 533; *Arias*, 984 F.2d at 1143.

### B. Sentence

Hankerson also argues, for the first time on appeal, that the district court erred by imposing a sentence of imprisonment and determining that she was ineligible for probation because it was improperly constrained by the guidelines commentary. She argues that 18 U.S.C. § 3561(a) and the Sentencing Guidelines clearly permit probation in her case (which allegedly is supported by the § 3553(a) factors), and the guidelines commentary cannot expand the interpretation of that unambiguous language. Thus, she argues that we should reverse and remand for resentencing to include probation as an option.

We generally review the procedural reasonableness of a sentence under a deferential abuse-of-discretion standard of review. *Gall v. United States*, 552 U.S. 38, 51 (2007). However, when, as here, a defendant does not raise a relevant objection at the time of sentencing, we review for plain error. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). To establish plain error, the defendant must show: (1) an error occurred; (2) the error was plain; and (3) the error affected her substantial rights. *Id.* If these three conditions are met, we may then exercise our discretion to correct

---

[4] The government also argues that any error in giving the instruction was harmless, because a reasonable jury could have convicted her on a theory of actual knowledge. Because we find that the district court did not err in providing the instruction, we need not reach this argument.

the error if, but only if, (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

With respect to the second prong, "[w]hen the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is [no] precedent from the Supreme Court or this Court directly resolving it." *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (quotations omitted). With respect to the third prong, an error does not affect a defendant's substantial rights unless there is a "reasonable probability" of a different sentence absent the error. *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005). The substantial rights analysis is like harmless error review, but the defendant, not the government, "bears the burden of persuasion with respect to prejudice." *See United States v. Monroe*, 353 F.3d 1346, 1352 n.10 (11th Cir. 2003). Thus, "if the effect of the error is uncertain so that we do not know which, if either, side it helped the defendant loses." *Rodriguez*, 398 F.3d at 1300. The district court commits a significant procedural error if it calculates the guidelines incorrectly, fails to consider the § 3553(a) factors, bases the sentence on clearly erroneous facts, neglects to explain the sentence, or treats the guidelines as mandatory rather than advisory. *United States v. Hill*, 643 F.3d 807, 879 (11th Cir. 2011).

Section 3561 of Title 18 of the United States Code provides that a "defendant who has been found guilty of an offense may be sentenced to a term of probation unless[, among other factors,] . . . the offense is a Class A or Class B felony . . . ." The guidelines

incorporate the same statutory restrictions on probation identified in § 3561.  *See* U.S.S.G. § 5B1.1(b).  Hankerson's offense was a Class C felony.  So, the probation references in 18 U.S.C. § 3561 and the guidelines did not apply.

However, the class of felony is not the only factor in determining whether an individual is eligible for probation.  The guidelines only authorize probation for guideline ranges within certain zones of the Sentencing Table.  Hankerson's guideline range was in Zone C of the Sentencing Table.  The guidelines authorize a sentence of probation if:

> (1) the applicable guideline range is in Zone A of the Sentencing Table; or
>
> (2) the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of § 5C1.1 (Imposition of a Term of Imprisonment).

U.S.S.G. § 5B1.1(a).  The text of this provision does not mention Zone C or D of the Sentencing Table.  Comment 2 to § 5B1.1(a) states that "[w]here the applicable guideline range is in Zone C or D of the Sentencing Table . . . the guidelines do not authorize a sentence of probation."  U.S.S.G. § 5B1.1 cmt. (n.2).  And we have cited to this comment, stating that the "Guidelines do not authorize a sentence of probation where the applicable Guidelines

range is in Zone C or D of the Sentencing Table." *United States v. Pugh*, 515 F.3d 1179, 1200 (11th Cir. 2008).[5]

Hankerson argues that she was eligible for a probationary sentence under 18 U.S.C. § 3561 and the plain language of the guidelines, and that the commentary to the guidelines suggesting otherwise is not controlling. She cites *United States v. Dupree*, in which we held that the guidelines commentary cannot expand the interpretation of unambiguous sentencing guidelines. 57 F.4th 1269, 1273–77 (11th Cir. 2023) (*en banc*).

But her reliance on that decision is misplaced. The guidelines do not unambiguously state that probation is allowed for Class C felonies where the applicable guidelines range is in Zone C or D. While the guidelines do not expressly prohibit probation for Class C felonies, the guidelines only authorize probation when the applicable guideline range is in Zone A or B. The guidelines' express authorization of probation for Zone A and Zone B ranges and its silence as to ranges in Zone C implies the lack of authorization of probation for Zone C ranges. *See United States v. Curbelo*, 726 F.3d 1260, 1277 (11th Cir. 2013) (The negative implication canon "applies where items expressed are members of an associated group or series, justifying the inference that items not

---

[5] This implication is further supported by § 5C1.1 of the guidelines, which states that a minimum term of imprisonment may be satisfied by probation for Zone B. But here as well, probation is not listed for Zones C and D.

mentioned were excluded by deliberate choice, not inadvertence." (quotations omitted)).

Because the sentencing guidelines do not unambiguously state that probation is authorized for guideline ranges in Zone C or D, it is permissible to consider the guidelines commentary. *Dupree*, 57 F.4th at 1273–77. That commentary, and our caselaw interpreting that commentary, makes clear that the guidelines do not authorize a sentence of probation where the applicable guidelines range is in Zone C or D. *See Pugh*, 515 F.3d at 1200; § 5B1.1 cmt. n.2 ("Where the applicable guideline range is in Zone C or D of the Sentencing Table . . . the guidelines do not authorize a sentence of probation."). Thus, because Hankerson's applicable Guidelines range was in Zone C, it was not plain error for the district court to determine that she was ineligible for probation.

Regardless, the record does not indicate that the district court treated the guidelines as mandatory rather than advisory. *Hill*, 643 F.3d at 879 (noting that a district court commits procedural error when it treats the guidelines as mandatory). The district court stated that it considered the statements of all parties, the § 3553(a) sentencing factors, the "advisory guidelines," and the PSI. Moreover, the record supports the district court's decision to sentence her to both incarceration and home confinement, in lieu of probation. Accordingly, the district court did not err, and we affirm the district court.

**AFFIRMED.**