[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 3, 2006
THOMAS  K. KAHN
CLERK

No. 04-14450

_____

D.C. Docket No. 03-00345-CR-TWT-1-1


UNITED STATES OF AMERICA,

                            Plaintiff-Appellant,

    versus

MICHAEL L. MITCHELL,

                            Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Georgia

_____

**(February 3, 2006)**

Before ANDERSON, HULL and JOHN R. GIBSON[*], Circuit Judges.

JOHN R. GIBSON, Circuit Judge:

---

        *Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

The United States appeals the district court's post-trial acquittal of Michael L. Mitchell in this Medicare fraud case. The government contends that the district court erred in holding that it failed to marshal sufficient evidence to support the jury's verdict of guilty. We reverse the district court's entry of judgment of acquittal, but affirm its alternative order granting a new trial.

Mitchell was charged with one count of conspiracy to defraud the United States and four counts of money laundering. The conspiracy count alleged that Mitchell conspired to commit three types of fraud: (1) health care fraud, 18 U.S.C. § 1347 (2000), or the obtaining of Medicare funds by false and fraudulent pretenses and representations; (2) wire fraud, 18 U.S.C. § 1343 (2000),[1] or knowingly causing false and fraudulent billings for Medicare payments to be transmitted by wire in interstate commerce; and (3) knowing and willful making or use of a false writing or document in a matter within the jurisdiction of the executive, legislative or executive branch of the government of the United States, 18 U.S.C. § 1001(a) (2000). The charges were tried to a jury, which was instructed that it only had to find Mitchell had conspired to commit one of the three fraud offenses, but that all jurors had to agree which of the offenses he

---

[1] 18 U.S.C. §§ 1001 and 1343 were both amended after the date of the offenses alleged, and so we cite to the version in effect at the time of the offenses.

2

conspired to. The jury found Mitchell guilty on the conspiracy count, though the verdict form did not specify which of the substantive offenses the jury found Mitchell conspired to commit. The jury found Mitchell not guilty on the money laundering counts.

Mitchell moved for judgment of acquittal and filed an alternative new trial motion. The district court granted the judgment of acquittal, and in the alternative, granted a new trial. The district court held that the government introduced no evidence that would allow the jury to find that the Medicare claims filed by Mitchell's company were false or made with fraudulent intent. The jury was "left to infer fraudulent intent from the alleged illegality of the clinic's billing practices," yet the government never introduced evidence of what the law required "in the form of Medicare regulations, operational manuals, administrative rulings or judicial decisions which showed that the clinic's billing practices were so clearly illegal that an inference of fraudulent intent can be drawn." United States v. Mitchell, No. 1:03-CR-345-1-TWT, slip op. at 2 (N.D. Ga. July 7, 2004). The only Medicare manual referred to at trial was never introduced into evidence. Id. The district court held that although there was some evidence of falsification of records at the clinic, there was no evidence that Mitchell had any knowledge of or involvement in the falsification. Id. at 2-3.

## I.

We review de novo a district court's grant of acquittal under Fed. R. Crim. P. 29(c). United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999). We must determine whether the evidence at trial was sufficient to permit a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt, id., which is the same standard used to determine whether the evidence is sufficient to satisfy the demands of due process. See United States v. Allen, 302 F.3d 1260, 1262 (11th Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We must view the evidence in the light most favorable to the government, accepting the jury's reasonable inferences and credibility determinations. Glasser v. United States, 315 U.S. 60, 80 (1942), superseded by rule on other grounds, Bourjaily v. United States, 483 U.S. 171 (1987); Ward, 197 F.3d at 1079.

To prove conspiracy, the government must show the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of the conspiracy. United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). The elements of the three substantive offenses that were the subject of the conspiracy charge are similar to each other. Violation of 18 U.S.C. § 1001 requires: (1) that the defendant made a statement (2) that was false (3) and

4

material, (4) that the defendant acted knowingly and willfully, with specific intent, and (5) that the statement was made in a matter within the jurisdiction of an agency of the United States. United States v. Calhoon, 97 F.3d 518, 523 (11th Cir. 1996). Wire fraud under 18 U.S.C. § 1343 (2000) requires a defendant's intentional participation in a scheme to defraud another of money or property and use of wires in furtherance of the scheme. Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991). The scheme to defraud must consist of actions that would have deceived a reasonably prudent person, committed with a conscious, knowing intent to defraud. Id. at 1499. Health care fraud under 18 U.S.C. § 1347 requires knowing and willful execution of or attempt to execute a scheme to defraud a health-care benefit program in connection with delivery of or payment for health care.

## II.

In 1999, Mitchell established a medical clinic, Family Physical Medicine, with a business plan similar to clinics Mitchell operated in Houston. Family Physical Medicine entered into an agreement with Mitchell's company MLM, Inc. for MLM to do the Atlanta clinic's Medicare billing. Mitchell's sister, Stephanie Locke, was named as Director of the clinic. When the clinic commenced operations in July 1999, it employed Mitchell's brother-in-law, Bruce Locke, as

Vice President for sales; an office manager, Valencia Boone; a physician, Dr. Stephen Dawkins, who worked six to eight hours per week, as medical director; another physician, Dr. Green; and a physical therapy technician, Curley Daniel.

The clinic's method of doing business was that Bruce Locke would attend health fairs frequented by senior citizens and encourage them to sign up for physical therapy. Dawkins would then go to the patient's home, examine the patient, and develop a treatment plan for physical therapy. The physical therapy technician would then go to the patients' homes alone and perform the therapy. Dawkins testified that he was not responsible for supervising the physical therapy technicians who performed the therapy. His employment contract with the clinic described his duties as "performing initial, as well as, follow-up evaluations;" it said nothing about supervising the therapy. Dawkins testified that after developing the treatment plan, he did not "in any way interact with a therapist," although he also said on cross examination that he made follow-up visits to the patients and so did Dr. Green. Curley Daniel denied knowing Dr. Dawkins, although she was apparently the only technician working for the clinic in July 1999. Likewise, Dr. Dawkins testified that he never knew Daniel. Daniel said that the doctors did not supervise her when she was out of the clinic. Although she said that she conducted therapy in accordance with the doctors' instructions,

6

those instructions were relayed to her through Boone or Stephanie Locke when she was going to the patients' homes. Valencia Boone said Dr. Dawkins's duty was "only to make that first assessment" of the patient's needs. Boone wasn't sure Dawkins saw the patients' charts after the technician began treatments "unless [the technician] had some sort of question or if they felt like the patient needed something different. Then they would contact Dr. Dawkins to find out what they should do."

Physical therapy technicians are minimally-trained, low-paid workers; it is undisputed that under Medicare regulations, physical therapy technicians must work under the direction of a skilled provider (a medical provider who is licensed and enrolled with Medicare) for Medicare to pay for their services. In contrast, a licensed physical therapist has a college degree in physical therapy and can work as a skilled provider in his or her own right.

By October or November 1999, Boone had begun to question whether it was permissible to use technicians rather than licensed physical therapists. About that time, Curley Daniel told Mitchell that "we needed a physical therapist on premises with us," but she did not explain at trial why she thought so. Daniel said Mitchell told her, "If you don't like what's going on here, you can basically, like, leave." Boone overheard the conversation and asked Mitchell about whether it was

7

permissible to have technicians do the work of therapists; he assured her that it was fine and that was how his clinics in Texas did business. At the end of 1999, Valencia Boone and Dr. Dawkins quit working for Family Physical Medicine.

After Boone left, Mitchell's sister, Stephanie Locke, took over as office manager at the beginning of 2000. Stephanie Locke changed the clinic's method of doing business by providing the physical therapy services inside the clinic. During this time, the clinic had a number of personnel come and go. Dr. Shannon Fields testified that he began working for the clinic at the end of 1999 or beginning of 2000 and that the clinic was in transition to providing the physical therapy at the clinic building. Dr. Fields testified that he worked 15-20 hours per week doing physical exams and case histories and observing what he called the "therapist's" work. Fields said a Dr. Omiago alternated days with him for some unknown period of time, and that the clinic also hired a physician's assistant, Troy Johnson. Fields said the clinic hired another physician, Dr. DeAlbuquerque, about a month before Fields resigned. Curley Daniel and technician Karene Lamoi Benoit testified that after the clinic began treating patients in-house, the doctors did supervise them and they were told not to treat patients unless a physician was present in the clinic.

After Boone and Dr. Dawkins quit working for Family Physical Medicine, they worked together in another business. Stephanie Locke asked Boone if she could get Dawkins's signature on some documents he had failed to sign while he worked at Family Physical Medicine. Dawkins let Locke have his signature stamp. Family Physical Medicine affixed his stamped signature to records relating to services provided after he left. Dawkins did not authorize this use of the stamp.

Throughout its existence, Family Physical Medicine experienced severe financial difficulties. Of approximately $2.4 million in Medicare billings, Medicare only paid $490,828.22, apparently due at least in part to the clinic's inability to submit the bills properly. The clinic went out of business sometime in the second half of 2000.

### III.

This case presents two kinds of alleged false statements: (1) submission of claims for services that were not eligible for Medicare coverage, and (2) submission of claims based on forged documentation, in particular, the use of a doctor's signature stamp without his permission. The first type of statement was allegedly deceptive by virtue of the fact that the claim submitted was not allowable under the law at the time the claim was filed. See United States v. R&F Props. of Lake County, Inc., -F.3d-, No. 04-15283, 2005 WL 3557420, at *5 (11th Cir. Dec.

9

30, 2005) ("Medicare claims may be false if they claim reimbursement for services or costs . . . that . . . are not reimbursable . . . ."); United States v. Calhoon, 97 F.3d 518, 529 (11th Cir. 1996) (crux of 18 U.S.C. § 1001 offense was "the filing of reports intended and designed to deceive and mislead the auditors for the purpose of obtaining reimbursement of costs Calhoon knew to be at least presumptively, if not clearly, non-reimbursable").  It was therefore incumbent on the government to introduce evidence of what the Medicare laws and regulations permitted and forbad during the period alleged in the indictment in order to establish both that the claims were deceptive and that Mitchell acted with scienter.  "In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." United States v. Whiteside, 285 F.3d 1345, 1351 (11th Cir. 2002); accord United States v. Parker, 364 F.3d 934, 944-45 (8th Cir. 2004).  In other words, if the law that makes a statement false is ambiguous and the defendant's statement was consistent with one reasonable interpretation of the law, the government must rule out the possibility that the defendant was acting in reliance on that interpretation. Some courts analyze the question as going to the element of false statement, e.g., United States v. Rowe, 144 F.3d 15, 21-23 (1st Cir. 1998), and some as going to

10

the element of scienter, e.g., Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1053-56 (8th Cir. 2002) (civil false claims case).

The district court considered the theories advanced by the government to establish that Mitchell's businesses violated clear Medicare rules: (1) that the services were not billable because they had not been performed by a "skilled provider," and (2) that the services were not billable because in the second half of 1999, the services had been provided by a technician in the patients' homes instead of in a clinic with a physician present.

The government contends that "physical therapy provided by unlicensed technicians" was not billable under Medicare. Government Brief at 21. However, the government's evidence at trial indicated that this principle is overstated and that under some circumstances physical therapy technicians' services could be billed under Medicare.

The government did not introduce any statute, regulation, policy or other written authority governing the circumstances under which physical therapy technicians' services could be payable under Medicare. It did adduce the testimony of an investigator, Karen Hurley, who testified generally that for physical therapy services to be billable to Medicare, "The services must be

11

medically necessary to treat an injury or an illness, and they must be provided by a skilled provider."  Hurley testified that a physician or physical therapist can be a "skilled provider."  She said, "A group that is enrolled with medicare can only bill for services for physicians that are employed by that group and who are licensed and enrolled with Medicare."

Hurley's testimony taken at face value would thus support the conclusion that it is flatly illegal to bill Medicare for services provided by a technician, rather than a skilled provider.  However, Hurley herself contradicted this conclusion. She stated that the requirements for billing medical procedures would be set forth by Medicare in local medical review policies and she identified such a policy for physical therapy.  The government failed to introduce the policy into evidence and the policy, identified as Exhibit 10, was dated July 11, 2000, which would have been after the relevant date for the bills at issue.  Nevertheless, Hurley was allowed to testify that the policy stated:

> For claims submitted by a physician, services performed by nonemployees or not under a physician's direct supervision are not covered. . . .  Services that do not require the professional skills of a physician to perform or supervise them are not medically necessary.
> Q: And what is the import of that policy statement?
> A: It indicates that the services should be performed by a skilled provider or under his direct supervision.

(emphasis added).  Hurley's testimony thus establishes that services do not have to be performed by the physician if the physician "directly" supervises them, so the government's evidence does not establish a per se rule that technicians cannot perform the therapy.  Moreover, the Assistant United States Attorney arguing this appeal admitted that it was permissible to use technicians under the supervision of a doctor.  Therefore, the district court did not err in concluding the government had failed to prove that treatment by the technicians was per se illegal.

The government also contends that the services rendered in 1999 were non-billable on the ground that they were performed by a technician in the patients' homes instead of at a clinic with a physician present.  We must determine whether the rule as set out in Hurley's testimony clearly prohibits billing for technicians' services not rendered within the clinic with a doctor present.

The question of whether the law was ambiguous is one for the court, not the jury.  United States v. Prigmore, 243 F.3d 1, 18 (1st Cir. 2001).  In a civil False Claims Act case this Circuit recently considered whether non-physician employees' services could be billed as "incident to" the services of a physician under the Medicare program if the physician was not present on the premises at the time of the service.  In United States v. R&F Properties of Lake County, Inc., -F.3d-, No. 04-15283, 2005 WL 3557420, at *5 (11th Cir. Dec. 30, 2005), we held

that the regulations and policies existing before 2002 were ambiguous. Unfortunately, we must decide the question on the record before us, which is limited to Hurley's statement of the law, unlike the fulsome record provided in R&F. A reasonable person could interpret "directly supervise" to apply where a physician drew a treatment plan to be followed by a technician, consulted with the technician before and after each treatment, was available for consultation by telephone or pager during the visit, and conducted follow-up examinations to ascertain the patient's progress, even if the therapy occurred in the patient's home instead of in a clinic where the physician was present. Thus, the words "direct supervision" in the record are ambiguous with regard to whether a home visit by a technician could be billable, and a reasonable person could interpret those words to extend to oversight of technicians conducting home visits.

Since the law as presented by Investigator Hurley was ambiguous, it was up to the government to show that the language in context would have been understood to preclude the kind of claims Family Physical Medicine filed. In short, the government had to show that at the time of the claims, the government and Mitchell understood "supervision" to hinge on whether the physician was present in the same premises with the technician. See R&F, 2005 WL 3557420, at *5-6.

14

Hurley testified on cross examination that it was necessary for the physician to be at the site where services were provided in order to bill Medicare for the services of non-physician employees, including physical therapy technicians: "The physician must also be present in the office when the services are provided." However, she did not refer to any statute, regulation or other published authority that enshrined this rule or state when the rule first became effective. Similarly, Valencia Boone testified that she had eventually learned, "A physical therapy tech can only work inside a clinic under the direct supervision of a physician," but she did not identify the basis for her opinion or state when she formed the opinion. Curley Daniel testified that she told Mitchell that "we needed a physical therapist on premises with us," but she did not state the basis for this opinion.

There was evidence at trial that a change in Medicare rules caused Mitchell to change the clinic's practice of providing therapy in the patients' homes. Bruce Locke testified that after Family Physical Medicine began business, there were "some Medicare laws and changes and stuff, and we had to start bringing the patients to the clinic." Locke said he was not personally familiar with the rules, but that "you could hear the ruckus" the week a letter came changing the rules. Locke explained,

Well, there was some sort of Medicare form that came in the mail, and Michael had some people review it, some more of the inept people, I guess, because he had some more people review it, and then he came to the conclusion that we'll bring the patients to the clinic; thus, increasing the cost to do business because he had to hire the transportation to bring them there.

The government's investigator Priscilla Boyd also confirmed the idea that the rules governing billing for services provided by physician's employees were changed or clarified in 2000:

> Q: What we're talking about is what services can be provided under the supervision of a doctor.
> A: Right.
> . . . .
> Q: And what the rules and regulations are that govern that, correct?
> A: Correct.
> Q: And what you can bill for and what you can't, correct?
> A: Correct.
> Q: All right. Now, the only point I wish to make is that in the middle of 2000, that newsletter put out by Medicare acknowledged that in the industry, there was a lot of confusion as to what that meant and what the proper application of that term was, correct?
> A: That's what the newsletter indicates.[2]

In sum, rather than introducing any written statute, regulation, policy or other authority establishing that a technician's services pursuant to a physician's orders were not "directly supervised" by the physician if the physician was not physically present in the same clinic, the government relied on testimony of an

---

[2]The newsletter identified as Defendant's Exhibit 1 was not introduced into evidence.

investigator. That investigator did not identify when the rule she cited became effective. Other testimony by government witnesses established that there was a change or clarification in the applicable rules well into the alleged conspiracy period, following which Family Physical Medicine changed its practices to comply with Mitchell's new understanding that technicians had to be in the same building with the physician. On this record, the government did not bear its burden of proving that Family Physical Medicine intentionally submitted bills that were not legally payable solely by virtue of the technician's treatment occurring in the patient's home.

We emphasize that we express no opinion as to what the actual state of the Medicare laws, regulations, or policies was at the time of the conduct charged. Neither party supplied any direct evidence of what the law required at any particular time other than the testimony we have discussed, and our business is limited to the state of the record before the jury. We are mystified as to why the government neglected to introduce such regulations if the rule was clear at the time the services were rendered. Nevertheless, on the record before us, the government has not borne its burden of proof either that the claims were illegal at the time filed or that Mitchell had the necessary scienter in connection with the filings merely because the services took place in the patients' homes.

17

Although we have determined that the district court's assessment of the government's two principal theories of guilt was correct, it is nevertheless necessary to consider whether the government proved that Mitchell's businesses were billing for technicians' services that no one reasonably could have thought were "directly supervised" by a physician. There was evidence that Dr. Dawkins did not supervise the technicians because he did not believe it was his responsibility to do so. Although Dr. Dawkins testified that he examined the patients, drew up the plan for physical therapy, and conducted follow-up examinations on the patients, the record shows that there was no contact whatsoever between Dr. Dawkins and Curley Daniel, the technician who began working in July 1999. Dr. Dawkins testified that after he developed the treatment plan, he was not responsible for supervising the "therapists" and that he did not interact with the technician in any way. No one asked him whether he was aware that the therapy was being performed by a "technician" rather than a "therapist." Curley Daniel testified that when she began working for Family Physical Medicine, there was no physician on staff, although she said she had heard of Dr. Dawkins. She testified that she did not know Dr. Dawkins and she did not work with him. However, she later identified Dr. Green's signature and agreed that he had done the evaluation of a patient whose records were being discussed. She did

18

say that she could not go out to treat a patient without an evaluation and instructions from a doctor and that the doctor had to examine the patient periodically to assess the progress of the treatment. She said she got the doctor's instructions from her "supervisor"–apparently meaning Boone or Stephanie Locke. Another technician, Karene Lamoi Benoit, testified that she began work in August 1999 and she worked with Dr. Dawkins.

We conclude that there is no reasonable interpretation of "direct supervision" that would cover Dr. Dawkins's relationship with Curley Daniel, and indeed, that Dr. Dawkins did not consider himself to be supervising Curley Daniel, but appears to have been under the impression that the therapy was being performed by a licensed physical therapist. Mitchell, however, gave Boone instructions to hire technicians and it was technicians, not physical therapists, that the clinic sent to the patients' homes. This evidence would allow a reasonable jury to find that the claims filed in 1999 for in-home services by technicians were fraudulent and Mitchell knew them to be so.

The government further contends that even after the clinic began providing its services in-house with a physician present, there was no supervision of the technicians. However, the technicians testified that after the therapy was moved into the clinic, Dr. Fields and Dr. DeAlbuquerque did supervise them. The

government contended at oral argument that inadequate supervision could be inferred from the fact that Dr. Fields only worked about twenty hours a week; however, the government admitted that there was another doctor on staff at the time, and the government neglected to introduce evidence about how much that doctor was at the clinic. The government also contends that Dr. Fields established lack of supervision when he said that he did not follow up to assure that patients' therapy was discontinued when he ordered it to be; however, since there was no showing that any patient received therapy after Fields ordered therapy discontinued, Fields's statement would not support an inference of conspiracy to commit fraud.

In sum, we conclude that the government did indeed adduce evidence that in 1999 Mitchell's clinic was engaged in a systematic practice of billing for the services of unlicensed technicians whose work was not directly supervised by a skilled provider. Though the government's more specific theories failed for lack of evidence, the record was sufficient to allow a reasonable finder of fact to conclude that Mitchell conspired to engage in a fraudulent scheme to obtain Medicare payments for services performed without a sufficient degree of physician supervision.

20

## IV.

There was evidence at trial that Family Physical Medicine used Dr. Dawkins's signature stamp on Medicare claims without his authorization to do so. The question is whether there was any evidence linking Mitchell to the misuse of the stamp.

The government indicted Stephanie Locke alone on five charges of false statements based on use of this stamp, but she was determined to be physically incapable of proceeding to trial and so her case was severed. Whatever Stephanie Locke's culpability may have been, the government did not show that Mitchell had anything to do with the misuse of the stamp. Valencia Boone said that to the best of her knowledge, Mitchell had nothing to do with getting the stamp and she had no reason to think he was aware that it had happened. There was no evidence tying Mitchell to the unauthorized use of the stamp. The district court did not err in concluding that the evidence was insufficient to support the conspiracy verdict on the stamp theory.

## V.

Because we conclude that the government proved that Mitchell conspired to engage in a fraudulent scheme to bill for the services of inadequately supervised technicians, we must reverse the district court's entry of judgment of acquittal.

Accordingly, we must consider whether the district court's alternative order of a new trial was permissible.

We review for abuse of discretion a district court's grant of new trial on the ground that the verdict was against the weight of the evidence; however, the particular abuse of discretion standard employed in this situation is more searching and rigorous than the name would suggest. See United States v. Hernandez, - F.3d-, No. 04-16663, 2005 WL 3525613, at *7 (11th Cir. Dec. 27, 2005); Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004). While the district court may weigh the evidence and assess the credibility of the witnesses, the district court may not set aside the verdict unless the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to let the verdict stand. Butcher, 368 F.3d at 1297.

Here, the government pursued various theories of guilt that failed entirely for lack of evidence. The one theory that supports the conspiracy conviction was based on an inference that Mitchell knew that Dr. Dawkins was not providing supervision of the technicians. This inference was tenuous and the district court did not abuse its discretion in granting the motion for new trial.

Accordingly, the judgment of acquittal is REVERSED and the order granting a new trial is AFFIRMED.

HULL, Circuit Judge, specially concurring:

I concur in the judgment only.