[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 18, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11422

_____

D.C. Docket No. 05-20849-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS JACINTO MARTI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 18, 2008)**

Before ANDERSON, HULL and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

Dr. Luis Jacinto Marti was convicted on one count of conspiring to defraud the United States, commit health care fraud, and pay and receive health care kickbacks. He was also convicted on fifteen substantive counts of health care fraud and aiding and abetting. The crux of Marti's appeal is that the evidence against him was insufficient because his signature was forged on the documents that form the basis of the charges. Marti seeks reversal of his convictions on the following grounds: (1) insufficient evidence; (2) prejudice from "fatally flawed" substantive counts; (3) improper admission of evidence regarding civil violations; (4) improper admission of evidence regarding "superbills"; and (5) improperly charging the jury on deliberate ignorance. The district court rejected these arguments and denied Marti's post-trial motion for acquittal or new trial. We affirm.

## BACKGROUND

Marti was indicted on one count of conspiracy to defraud the United States, commit health care fraud, and pay and receive kickbacks under 18 U.S.C. § 371, and fifteen counts of health care fraud and aiding and abetting under 18 U.S.C. §§ 2 and 1347. The indictment charged three other individuals with the same violations: Onelio Baez, Juan Carlos Mateo, and Jorge Valido. The other defendants pled guilty prior to trial. The district court described the charged conspiracy as follows:

2

The Government alleged that Marti and [the other defendants] were part of a Medicaid fraud scheme in which Medicaid recipients were induced through payments of kickbacks and bribes to visit particular physicians and medical clinics. Physicians at these particular clinics would prescribe unnecessary and expensive medications, such as Intravenous Immune Globulin ("IVIG") drugs, which are drugs commonly prescribed for HIV-positive or AIDS patients. These prescriptions, paid for by Medicaid, would be filled and picked up at the particular pharmacy that filled the prescription. The drugs would then be resold to other pharmacies.

Marti was charged as one of the doctors who issued a number of these prescriptions. Baez was charged as the organizer of the scheme. Mateo was charged as a patient recruiter and Valido, another doctor, was charged for issuing the prescriptions, and he was also charged as the owner and operator of the Charitte Medical Center where Marti once worked as a physician.

Order Denying Marti's Motion for Judgment of Acquittal at 1-2.

Both Baez and Valido testified on behalf of the government at Marti's trial. Baez admitted his involvement in the conspiracy, but testified that he did not know Marti and had never spoken or met with him. Baez paid others to recruit Medicaid patients and take them to participating clinics to obtain prescriptions for IVIG drugs. Valido was a physician in Cuba before he immigrated to the United States in 1994. In early 2000, although not a licensed physician in the United States, Valido opened a clinic called the Charitte Medical Center ("Charitte"). Marti was the only physician employed at the clinic and thus was the only person at Charitte who could issue prescriptions. He was present only once or twice per week to review the patient files

3

and sign prescriptions. He spent an hour or two at the clinic each time he visited and was paid $750 per week for his services. The clinic also employed two physician's assistants, who were responsible for seeing the patients, and they left prescriptions already written out for Marti to sign when he dropped by.

In October 2000, Valido obtained a restricted license to practice medicine, which required that he work under the direct supervision of a fully licensed physician. Marti volunteered to be Valido's supervising physician. Regulations required Marti and Valido to practice in the same clinic for the first year of Valido's restricted license. Despite this requirement, Valido closed Charitte and began practicing at a clinic in South Miami, while Marti practiced at an office in Hialeah. During the first year of Valido's restricted license, Marti visited Valido's clinic once or twice. Valido continued to issue medically unnecessary prescriptions for Medicaid patients at the South Miami clinic. However, Valido could not issue prescriptions himself during the first four months of his restricted license, and thus Marti was the only physician at Valido's clinic who could sign prescriptions.

Regulations also prohibited Marti from receiving compensation for supervising Valido. Over objection, Valido briefly testified that he completed insurance company "superbills" for the patients he saw at his office. He then gave the superbills to Marti,

and Marti submitted them. The two would then split the money received from the insurance companies.

In August 2001, Marti telephoned Valido because he received a subpoena for the files of eighteen or twenty of Valido's patients. Valido brought copies of the files to Marti at his home. Marti reviewed the files and instructed Valido three times to make corrections or alterations to the files before Marti delivered the files to the Medicaid Fraud Control Unit.

In 2004, Marti testified in his deposition that the majority of the patients were seen by Valido under his supervision. Marti identified his signature in several patients' files from Charitte. Six of the charts on which Marti identified his signature were for patients who had been prescribed unnecessary IVIG drugs and who correspond with the charges in the indictment.[1] Marti further stated that he would not have signed a patient's chart unless he had personally observed Valido's interaction with the patient. Marti now admits he was untruthful in this deposition about his supervision of Valido.

---

[1] The charts that Marti identified as containing his signature correspond to the following patients' charts: GX 1-J (Count 2), GX 1-G (Count 8), GX 1-R (Count 11), GX 1-C (Count 13), GX 1-B (Count 14), and GX 1-M (Count 15). The other patients' charts that Marti admitted contained his signature, GX 1-F and GX 1-S, were for patients who had been prescribed IVIG drugs pursuant to a prescription issued by Marti, according to the Medicaid records pertaining to the twenty patients analyzed by the data (GX 15).

Dr. Michael Wohlfeiler testified as an expert for the government. He reviewed the files of the patients who were the basis of the substantive counts in the indictment, and he concluded that none of the files supported or established the medical necessity of using IVIG drugs. The files were poorly documented, lacking in the necessary tests to establish whether IVIG treatments were appropriate, and lacking records of the administration of IVIG drugs, which must be given intravenously with someone monitoring the patient's vital signs during the treatment.

Marti asserts that unauthorized recommendations for IVIG drugs were written in the files after he had signed them. Wohlfeiler testified that many of the documents recommending IVIG drugs appeared to be signed by someone other than Marti. The lead investigator in the case, Lt. Eller, later conceded that no analysis of the documents had been done before the government presented evidence to a grand jury. At the time of trial, Eller acknowledged that he did not know whether the prescription documents that form the basis of the substantive charges contain Marti's genuine signature.

Danielle Seiger, an FBI forensic document examiner, examined 401 documents that were either prescription forms or documents from patient files and compared the writing on them to Marti's known signature. Seiger identified some of the signatures on patient charts as Marti's authentic signature. However, she found that the majority

of the documents contained "simulated signatures," which a layperson would refer to as "forgeries." Specifically, she concluded that the signatures on each of the prescriptions that form the basis of the substantive counts were either simulations or "not comparable to the known signatures of Dr. Marti." Seiger testified that many of the simulations appeared well-practiced. Based on this testimony, the government argues that at least some of them were "authorized simulations," meaning Marti authorized someone else to sign his name on the documents. Seiger did not attempt to determine whether documents had been altered after Marti signed them.

In 2006, Marti was found guilty on all counts. His motions for judgment of acquittal and a new trial were denied. The district court sentenced him to 28 months of imprisonment, followed by three years of supervised release, and ordered him to pay joint and several restitution with his co-defendants in the amount of $1,200,000.00. The district court departed downward from the Guidelines range based on Marti's "impeccable prior record, his contributions to the community and society, and his advanced age [of 75] and the fact that he has relinquished his medical license."

**DISCUSSION**

A. Sufficiency of the Evidence

We review de novo a claim that the district court erred in denying a motion for acquittal on sufficiency of the evidence grounds. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). In so doing, we consider the evidence in the light most favorable to the government and determine whether "a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt." Id. The government need not disprove "every reasonable hypothesis except guilt." Id. However, evidence is insufficient to sustain a conviction where it is "wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." United States v. Kelly, 888 F.2d 732, 740 (11th Cir. 1989).

1. The Substantive Counts

Marti argues that the evidence was insufficient to sustain his convictions on the fifteen counts of health care fraud and aiding and abetting. To prove health care fraud under 18 U.S.C. § 1347, the government must prove "knowing and willful execution of or attempt to execute a scheme to defraud a health-care benefit program in connection with delivery of or payment for health care." United States v. Mitchell, 165 F. App'x 821, 824 (11th Cir. 2006). To prove aiding and abetting under 18

U.S.C. § 2, "the government must prove that the defendant in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed." United States v. Broadwell, 870 F.2d 594, 607 (11th Cir. 1989).

Marti claims he was a victim in the conspiracy of the other defendants, rather than a knowing and willing participant. He asserts the evidence was insufficient because each substantive count was based on a prescription form that contained a forgery of his signature. The indictment lists fifteen specific counts of Medicaid fraud, each identified by a patient's Medicaid number and a claim date. According to Seiger's findings, the prescription forms that correspond to Counts Two through Fifteen contain either simulated signatures or signatures that are not comparable to Marti's signature.

Even if the signatures on the prescriptions are not genuine, the trial evidence, considered in the light most favorable to the government, is nonetheless sufficient to support the convictions. At a minimum, there was ample evidence to support a finding that Marti authorized the use of his signature on prescriptions for Valido's patients. During the period in which Valido was not licensed and was not permitted to sign prescriptions, Marti was the only doctor at Valido's clinic authorized to do so. Marti's genuine signature appears on numerous patient records containing references

9

to IVIG drugs being prescribed. Also, in preparing to comply with a subpoena during the investigation, Marti reviewed the patient files, did not disavow his signature or the authorization for his signature, and instructed Valido to make corrections and alterations to the charts. During his deposition, Marti again reviewed the patient files and acknowledged his signature on them. Several of these charts belonged to the patients who were issued the medically unnecessary prescriptions charged in the substantive counts. Marti also admits that he falsely testified at his deposition that he would not have signed a patient's chart unless he had observed Valido with the patient. Thus, sufficient evidence was presented for a reasonable jury to conclude that, at a minimum, Marti authorized the use of his signature. As such, we need not determine whether the jury accepted or rejected Seiger's testimony regarding the genuineness of the signatures.

### 2. The Conspiracy Charge

Marti also argues that there was insufficient evidence to sustain the conspiracy conviction. The government must prove the following elements to establish a conspiracy under 18 U.S.C. § 371: "(1) an agreement between two or more persons, (2) an unlawful purpose, and (3) an overt act committed by one of the coconspirators in furtherance of the conspiracy." United States v. Perkins, 748 F.2d 1519, 1527 (11th Cir. 1984). The government must also prove that Marti knew of the conspiracy

10

and "intended to associate himself with the objectives of the conspiracy." United

States v. Hollifield, 870 F.2d 574, 577 (11th Cir. 1989).

> While mere presence or association with others involved in a criminal scheme is not sufficient to prove participation in a conspiracy, the essential elements of a conspiracy can be proved by inference from the actions of the parties or by circumstantial evidence. Direct evidence of an agreement to join a criminal conspiracy is rare, so a defendant's assent can be inferred from acts furthering the conspiracy's purpose. The government is not required to prove that each alleged conspirator knew all the details of the conspiracy; it is enough to establish that a defendant knew the essentials of the conspiracy.

United States v. Mulherin, 710 F.2d 731, 738 (11th Cir. 1983) (internal citations

omitted).

The government established that Marti was the only physician working at

Charitte, and thus the only person capable of issuing prescriptions. He came to the

clinic once or twice a week for a few hours. When Valido obtained a restricted

license to practice medicine, Marti agreed to become his supervising physician. They

proceeded to ignore and violate numerous civil regulations that governed the

supervisory relationship. They also engaged in the scheme of submitting superbills

to health insurance companies and splitting the payments; this was done despite the

fact that Marti was not supposed to receive compensation for being Valido's

supervising physician. Marti also directed Valido to alter files before turning them

11

over in response to a government subpoena.  Finally, Marti was admittedly untruthful at his deposition.

None of the government's witnesses expressly testified that Marti participated in or knew of the conspiracy.  Baez did not even know Marti.  Nonetheless, the evidence presented regarding Marti's relationship with Valido is sufficient to demonstrate his knowledge of and willing participation in the conspiracy.

## B.  "Spillover" Prejudice from Substantive Counts

Because we find the evidence sufficient to sustain all of the substantive counts, we need not address Marti's argument that his conspiracy conviction must be reversed due to the spillover  effect of the substantive counts.

## C.  Evidence of Civil Violations

Marti argues that the district court improperly admitted evidence of alleged civil violations and allowed the government to suggest that the jury could convict Marti based on these violations.  The government presented considerable evidence that Marti flouted the regulations governing Valido's restricted license by not properly supervising Valido and not reporting Valido's misconduct.  "References to regulations are improper if their purpose or effect is to suggest to the jury that it could find a defendant guilty by reason of his violation of the regulation." United States v. Jakeway, 783 F. Supp. 590, 596 (M.D. Fla. 1992); see also United States v. Stefan,

784 F.2d 1093, 1098 (11th Cir. 1986) ("If the evidence of civil violations is introduced for purposes other than to show criminal misapplication and the evidence is not presented in such a way that the jury's attention is focused on the civil violations rather than the criminal ones, there is no error."). We review a district court's decisions regarding the admission of evidence for abuse of discretion. United States v. Arboleaz, 450 F.3d 1283, 1289 (11th Cir. 2006).

During the prosecutor's closing argument, he stated that Marti's failure to report Valido's misconduct is not a crime, but "is evidence that your common sense tells you proves Dr. Marti was an active and willing participant in this crime." The district court ruled that the government did not suggest Marti was guilty solely because he violated the regulations. Instead, the "regulations explained the relationship between Marti and Valido and framed the government's arguments regarding Marti's knowledge of the conspiracy." The use of the regulations to explain the relationship between Marti and Valido was permissible.

In this case, the evidence of civil violations was not "presented in such a way that the jury's attention [was] focused on the civil violations rather than the criminal ones." Stefan, 784 F.2d at 1098. Additionally, the district court gave a "curative instruction," stating "I caution you that the Defendant is not on trial for medical malpractice or for any issue related to Dr. Valido's restricted license." The district

13

court also explained that Marti could not be convicted based on negligence or foolishness, but only if he acted with "specific intent to defraud." Although the jury instruction could have stated more precisely that Marti was not on trial for violating civil regulations, it was sufficient to let the jury know that Marti could not be convicted solely on the basis of his failure to supervise Valido.

Because evidence of the regulations was appropriate to explain the relationship between Marti and Valido and because the district court adequately instructed the jury, the admission of evidence that Marti violated civil regulations was not an abuse of discretion.

### D. Evidence Regarding Insurance Company Superbills

Marti next claims the district court improperly allowed Valido's testimony regarding the submission of superbills to health insurance companies and the fact that Marti and Valido shared the resulting payments. Marti asserts that this testimony was unfairly prejudicial and inadmissible under Rules 403 and 404(b) of the Federal Rules of Evidence. Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence is admissible for other purposes, including to prove knowledge or intent. Fed. R. Evid. 404(b).

The district court characterized the superbill evidence as intrinsic and not subject to Rule 404(b) because "it is evidence of the arrangement between Valido and Marti in this conspiracy and demonstrates Marti's involvement in the operation of the [Miami] clinic." Evidence of other crimes or acts is "not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998).

The superbills were submitted to private insurance companies and were not involved in any scheme to bill Medicaid for improper drugs or services. Thus, the superbill evidence is unnecessary to the jury's understanding of the charged offenses and therefore extrinsic. See United States v. Chilcote, 724 F.2d 1498, 1501 (11th Cir. 1984) (explaining that testimony about flight was extrinsic where "testimony about appellant's involvement in the crime charged would have been completely comprehensible without testimony regarding appellant's claimed flight"). Because the superbill evidence is extrinsic, it is subject to Rule 404(b).

We follow a two-step analysis to determine whether extrinsic evidence is admissible under Rule 404(b). First, the evidence "must be relevant to an issue other than the defendant's character." United States v. Beechum, 582 F.2d 898, 911 (5th

15

Cir. 1978). Second, the evidence must comply with Rule 403, meaning that its probative value must not be substantially outweighed by the risk of unfair prejudice, confusion, or misleading the jury. See id. As the district court pointed out, the superbill evidence is relevant as proof of Marti's relationship with Valido and to show that Marti had some knowledge of the operation of Valido's clinic.

When evaluating evidence under Rule 403, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006) (quoting United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989)). In this case, there was little other evidence of intent to defraud or that Marti was involved in the operation of Valido's clinic. This increases the probative value of the superbill testimony. Cf. Beechum, 582 F.2d at 914 (noting if the government already "has a strong case on the intent issue, the extrinsic evidence may add little and consequently will be excluded more readily"). Although the district court incorrectly concluded the superbill evidence was intrinsic, the court did not abuse its discretion in admitting the evidence.

### E. Jury Instruction on Deliberate Ignorance

Finally, Marti argues that the district court erred in charging the jury on the theory of deliberate ignorance. We review de novo the district court's decision to

16

give a deliberate ignorance instruction. United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993). The district court included the following statement in its charge to the jury:

> [Y]ou may find that a defendant acted knowingly if you find beyond a reasonable doubt either, one, that the Defendant actually knew that he was acting in furtherance of the conspiracy or committing healthcare fraud; or, two, that he deliberately closed his eyes to what he had every reason to believe was the fact.

A deliberate ignorance instruction "is appropriate only when there is evidence in the record 'showing the defendant purposely contrived to avoid learning the truth.'" Id. (quoting United States v. Barbee, 968 F.2d 1026, 1033 (10th Cir. 1992)). Such an instruction should not be given "when the evidence only points to either actual knowledge or no knowledge on the part of the defendant." Id.

Marti argues that the evidence at most demonstrated negligent supervision of Valido, and none of the witnesses testified that Marti purposely avoided learning of the Medicaid conspiracy. He also claims that the prosecutor repeatedly argued he was a knowing and active participant in the conspiracy rather than arguing deliberate ignorance. However, the prosecutor argued that Marti intentionally stayed away from Valido's clinic and did "everything he could to blind himself to what was going on so that he could be in exactly the position his lawyers are going to take in front of the jury." The government's presentation of evidence regarding Marti's indifferent

17

supervision of Valido shows that the government intended to present a deliberate ignorance theory. Therefore, Marti's argument that the government argued only a theory of actual knowledge is unavailing.

The evidence in this case is sufficient to prove Marti's actual knowledge. As such, we may assume that the jury convicted on the basis of actual knowledge rather than deliberate ignorance, <u>see</u> <u>Stone</u>, 9 F.3d at 937-38, and any error in charging the jury on deliberate ignorance is harmless.

**AFFIRMED**.